Filed 5/1/25  Trunick v. Callaway CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SHELLEY TRUNICK, as Co-trustee et al., | F084692, F085293 |
| Plaintiffs and Appellants, | (Super. Ct. No. BPB-18-002894) |
| v. | |
| RICHARD CALLAWAY et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Kern County.  Andrew Kendall, Judge.

Dake, Braun & Monje, Craig N. Braun; Darling & Wilson, Joshua G. Wilson, for Plaintiffs and Appellants.

Ventura Coast Law, Kymberley E. Peck; Ferguson Case Orr Paterson, Wendy C. Lascher, for Defendant and Respondent Richard Callaway.

Clifford & Brown, Stephen H. Boyle and John R. Szewczyk, for Defendant and Respondent Gary Callaway.

-ooOoo-

This is a probate matter arising from a trust created by the Callaway family for Callaway family members. Two beneficiaries of the trust (siblings Richard Callaway and Gary Callaway) brought a petition for removal of the co-trustees of the trust (their other two siblings, Shelley Trunick and Wayne Callaway), for breaches of various fiduciary duties. Following a court trial on the petition, the probate court removed the co-trustees. The trustees appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Trust and Sub-Trusts at Issue

This case arises from the 1989 Callaway Living Trust (the trust), which was established on December 1, 1989, by Cecil Callaway and Elizabeth Callaway, a married couple, pursuant to a written declaration of trust. Cecil and Elizabeth had four children: Gary Callaway, Richard Callaway, Wayne Callaway, and Shelley Trunick (we will refer to all family members by their first names for clarity). Cecil died on October 28, 1998. Elizabeth died over 18 years later, on June 30, 2017.

Upon Cecil's death, pursuant to the trust instrument, the trust was divided into three separate sub-trusts, namely the Callaway Qualified Terminable Interest Property Trust (QTIP trust), the Callaway Survivor's Trust (survivor's trust), and the Callaway Family Trust (family trust).[1] The assets to be allocated to the survivor's trust consisted of the surviving spouse's (i.e., Elizabeth's) one-half interest in the settlors' community property and her separate property. The QTIP trust was to consist of the minimum dollar amount necessary as a marital deduction to eliminate or reduce federal estate tax upon Cecil's death. The balance of the trust's assets would represent Cecil's interest in the

---

[1] As reflected in the record, the Callaway Family Trust was also referred to, interchangeably, as the Callaway Marital Trust (marital trust).

settlors' community property and these assets, along with any separate property belonging to Cecil, were to be allocated to the family trust.

The QTIP trust and the family trust, became irrevocable upon Cecil's death. Elizabeth, as the surviving spouse, retained the power to amend or revoke the survivor's trust. During her lifetime, Elizabeth funded the sub-trusts and amended the survivor's trust multiple times. No party timely contested the validity of the amendments to the survivor's trust. In the Third Amendment to the survivor's trust, Elizabeth eliminated Gary as a beneficiary of her sub-trust. In the Fifth Amendment, Elizabeth resigned as trustee of the survivor's trust effective immediately, and appointed Shelley as the successor trustee of the survivor's trust. In the Sixth Amendment, Elizabeth limited Richard's interest to a $50,000 specific bequest, and named Shelley and Wayne as the only residual beneficiaries. The survivor's trust became irrevocable upon Elizabeth's death.

The instant matter solely concerns the family trust. Elizabeth served as trustee of the family trust until her death. Upon Elizabeth's death, under the terms of the trust, Wayne and Shelley became successor co-trustees of the family trust. Gary, Richard, Wayne, and Shelley are the residual beneficiaries of the family trust, with each of them granted an equal share (i.e., one-fourth) of the family trust's assets.

When Elizabeth died, the family trust and the survivor's trust each held separate, undivided one-half interests in a number of residential homes/apartment buildings in Oxnard: (1) 730 North G Street (single-family home); (2) 641 Ivywood Drive (single-family rental home); (3) 2042 North Ventura Road (six-unit apartment building); and (4) 2050 North Ventura Road (six-unit apartment building). The family trust also held an undivided one-sixth interest in a fifth Oxnard property, 737 North G Street (single-family

3.

rental home), while the survivor's trust held an undivided five-sixths interest in 737 North G Street.

## B. Relevant Trial Court Filings and Proceedings

### 1. Shelley and Wayne's Petition for Instructions Under Probate Code Section 17200

On August 29, 2018, Shelley and Wayne (co-trustees of the family trust) filed a "petition for instructions with respect to the distribution of property from the Callaway family trust and for approval of the payment of trustees' fees." (Some capitalization omitted.) In the petition, Shelley and Wayne sought the court's approval of their proposed distribution plan for the family trust's residual assets (as well as approval of trustees' fees for themselves). The proposed distribution plan was a "non pro-rata" plan. More specifically, the distribution plan was described by the trustees' attorney in a March 14, 2018 letter to the beneficiaries (the attorney's letter describing the distribution plan was attached to the trustees' petition for instructions). The letter only addressed the specific distributions to be made to Gary and Richard.

The March 14, 2018 letter from the trustees' attorney stated: "As previously advised, the Callaway [Family] Trust holds an undivided 50% interest in four properties. This includes the property located at 730 North 'G' Street, 641 Ivywood Drive, 2042 North Ventura Road and 2050 North Ventura Road in Oxnard, California. The other undivided interest in each of these parcels of real property is held by the Callaway Survivor's Trust." The letter noted that "[t]he Trustees have obtained appraisals for each of these four properties."[2] The letter specified: "[T]he Trustees have adopted a plan of distribution pursuant to which Gary Callaway and Richard Callaway will each receive an

---

[2] In a subsequent court proceeding, Shelley testified that the trustees initially were unaware that the family trust also held a portion of *737* North G Street; however, at some point the trustees realized that the family trust held a portion of 737 North G Street.

undivided 50% interest in the 730 North 'G' Street property along with an equalizing cash payment."[3] Although the letter did not address proposed distribution as to Shelley and Wayne's shares, at a subsequent court proceeding Shelley stated the plan was for her and Wayne to take their shares in the form of real property (that is, the rent producing properties).

Gary and Richard filed objections to Shelley and Wayne's petition for instructions. On January 6, 2020, the probate court held a final case management conference regarding the trustees' petition for instructions. The court's minutes from the case management conference noted: "The parties have stipulated to a procedure for moving forward. Parties stipulate that the case will be bifurcated. The sole issue for initial determination by the Court will be the appropriate valuation date [for valuing the trust properties] for implementation of the plan for distribution. That being whether to use the value as of the date of death or the value at or near the date of distribution." The initial trial phase in the bifurcated matter was conducted on paper briefs, with oral argument taking place on February 19, 2020. During trial, the trustees took the position that the distribution should incorporate date-of-death values, while Richard and Gary contended date-of-distribution values should be used.[4] Thereafter, on March 19, 2020, the trial court ruled that "any

---

[3] The 730 North G Street property was the Callaway family residence, where the Callaway siblings grew up; the Callaways moved into it in 1961. Shelley and Wayne kept this property vacant from June 30, 2017 (when their mother died) until October 23, 2020 (when it was sold). Unlike all the other properties in the family trust, 730 North G Street had never been rented. Richard Callaway testified at a subsequent court proceeding that 730 North G Street had been flooded and needed $70,000 in repairs. He stated that he and Gary disputed the trustees' valuation of this property.

[4] At the February 19, 2020 oral argument, counsel for Richard Callaway noted: "Ultimately … this whole thing would be very easy if [the] Trustees said we just want to liquidate everything and distribute cash percentage, but they're not, they want to purchase out of [the] trust for themselves certain assets. That's – that's why we're having this today." Counsel continued: "I'm not saying that it is wrong [for the Trustees to purchase

5.

plan of distribution of trust assets to beneficiaries shall be based on the fair market value of said assets at or near the time of distribution." The court set the second trial phase (a five-day trial for consideration of the trustees' proposed distribution plan) for October 14, 2020.

### 2. *Shelley and Wayne Took Unilateral Steps to Sell 730 North G Street Ahead of the Second Phase of the Trial, Prompting Richard to File an Ex Parte Application for Removal of the Trustees*

On October 2, 2020, the parties appeared for a case management conference in court. Around October 3, 2020, the trustees listed 730 North G Street for sale. The trustees did not reveal the fact that they had listed 730 North G Street for sale. Richard Callaway found out about the listing from the internet; he was not informed beforehand about the trustees' decision to list 730 North G Street for sale. On October 7, 2020, Richard Callaway filed a "verified ex parte application for removal of co-trustees for

---

trust assets] but it always causes everybody to slow down and look when you have a Trustee who is also a beneficiary to make sure that it's not self-dealing, that they are honoring their duty [of] impartiality." Counsel added: "All we are asking for is to honor Settlors' intent such that there is an equivalent or a proportionate fair market value of the distribution."

The court subsequently commented that the trustees did not have "unfettered discretion" with respect to distribution and that "there are limits based on their fiduciary obligations to the other beneficiaries." With respect to the timing of the valuation of the trust properties for distribution purposes, the court noted that the concern that Richard's counsel was alluding to was that utilizing current fair market values for valuation would "make it more difficult for [the trustees] to buy out these properties" as it would "cost them more money."

Counsel for the trustees responded: "Well, and our position is and always has been at the time the plan of distribution was adopted, okay, that's the focus, not fair market value today." The court observed: "Yeah, and I think what [Richard's counsel's] argument about the fiduciary obligations, the reason your clients are struggling so mightily to hold onto that previous valuation is because they want to hold on to the property, they want to buy out the other beneficiaries [and] they don't want to have to pay that increase. That's the self-dealing she's alleging."

breach of fiduciary duty; appointment of neutral successor trustee; surcharge against co-trustees' interest for breach [of] duty; immediate distribution of specific bequest; attorneys' fees and costs." (Capitalization omitted.)

Richard's ex parte application noted "exigent circumstances" necessitated ex parte action. (Capitalization omitted.) The application stated: "[I]t has been discovered that Co-Trustees are attempting to sell Trust real property. They listed the property without notice or consent of the beneficiaries and in direct contradiction to the Plan for Distribution they presented to this Court and have set for a five (5) day trial commencing October 14, 2020."

Richard's ex parte application, which attached the MLS listing for 730 North G Street, further stated: "Co-Trustees never revealed that they were preparing the 730 [North G Street property] for sale, let alone that it is currently listed for sale, with a sale pending [that is, the trustees had accepted an offer for the purchase of the property]." The ex parte application added: "Co-Trustees provided NO NOTICE or information, at all, through any informal or formal settlement discussions. They served no Notice of Action by Trustee, nor does this pending sale comport with the very Plan for Distribution they have presented this Court to approve at trial. Accordingly, and since it is clear Co-Trustees do not understand/believe that they owe a fiduciary duty to all Trust beneficiaries, a *Lis Pendens* has been recorded on the 730 [North G Street property] and is attached hereto."

Richard's ex parte application requested "immediate removal of co-trustees and appointment of a neutral successor trustee." (Capitalization omitted.) The application stated: "Co-trustees have had 3 years, with guidance by counsel, and have consistently demonstrated their inability to administer this Trust. The roadblocks to administration center on the fact that Co-Trustees want to apportion valuable property to their side of the

7.

column and less valuable property to Rick[5] and Gary's side. … To strong-arm Rick and Gary into an inequitable distribution plan, Co-Trustees have consistently acted to prevent Rick and Gary from obtaining any information regarding the Trust or the true value of the Trust properties."

Finally, Richard's ex parte application noted that "Co-Trustees have wrongly withheld a $50,000 specific bequest from Rick for three years[,] while distributing trust real property to themselves." (Capitalization omitted.) Richard's ex parte application added: "Under the Survivor's Trust, Rick is entitled to a $50,000 specific bequest. Despite multiple requests that this bequest be distributed or, if it was not going to be distributed, an accounting of the Survivor's Trust be provided such that Rick can ascertain why the gift is being withheld[;] Co-Trustees have refused to provide him this bequest."

The ex parte application further stated that meanwhile, "Shelley [distributed] a piece of real property to herself from the Survivor's Trust in August 2019," namely 9700 Valley Forest Court (a copy of the recorded deed for 9700 Valley Forest Court "showing it was transferred to Shelley Trunick in August 2019" was attached to the ex parte application). The ex parte application requested the court to order that "[t]he $50,000.00 specific bequest, with legal interest, shall be paid forthwith to Rick from the Survivor's Trust and surcharged against Co-Trustees' interest in the Trust." As indicated, Richard also recorded, around the same time as he filed his ex parte application for removal, a lis pendens against the 730 North G Street property.

On October 9, 2020, a final case management conference was held with regard to the second phase of the trial on Shelley and Wayne's petition for instructions with respect to the distribution of property from the family trust. The trial was set to start on October

---

[5] The ex parte application clarified that Richard was also known as Rick.

14, 2020. However, counsel for Shelley and Wayne told the court that the trustees now wished to dismiss the petition. The court dismissed the petition[6] but noted: "The Court finds that the plan outlined in the petition for instructions is no longer the plan of distribution, however any distribution shall be based on the appraisal used at the time of distribution. The Court's prior ruling shall remain in full force and effect." The court set Richard's ex parte application for removal for an evidentiary hearing starting on October 14, 2020. Meanwhile, on October 14, 2020, Shelley and Wayne filed a motion to expunge the lis pendens on 730 North G Street, along with an ex parte application for an order shortening time for the hearing on the motion.

### 3. *Evidentiary Hearing on Richard's Ex Parte Application for Removal (First Day, October 14, 2020)*

An evidentiary hearing on Richard's ex parte application for removal was held on October 14, 2020 (Gary joined Richard's petition). The trial court noted, at the outset, that while it could not remove trustees on the basis of an ex parte pleading, it had the authority under Probate Code section 15642, subdivision (e) to suspend trustee powers. The court elected to "treat this [application] as a petition to suspend under [Probate Code section] 15642[, subdivision] (e)." The court observed: "[T]here's two issues that we're going to try on an ex parte basis, which means there needs to be some kind of exigency for them. One is the suspension of [trustee] power and the other is the request for [the special bequest of] $50,000, that it be paid immediately." Richard's counsel agreed with

---

[6] Counsel for Shelley and Wayne, in an email to Richard's counsel dated October 12, 2020, explained the reason for withdrawal of the petition for instructions: "[W]e will be filing a Motion to Expunge [Richard's] Lis Pendens unless you will agree to voluntarily release the lis pendens. … [¶ ] I do not intend to waste too much time arguing the merits of the Motion other than to point-out that as a result of the Petition [for Instructions] being withdrawn, your argument that your client has an interest in the property based upon the Plan of Distribution contained in the Petition is gone."

the court's summation but informed the court that Richard had also filed a properly-noticed petition for removal of trustees for various breaches of fiduciary duty that was scheduled for hearing at a later date (the properly-noticed petition for removal of trustees was filed on October 13, 2020).

Richard's attorney gave an opening statement in which she said that the trustees had breached numerous fiduciary duties including failing to administer the trust under Probate Code Section 16000, failing to deal impartially with beneficiaries under Probate Code section 16003, failing to avoid conflicts of interest under Probate Code section 16004, failing to exercise discretion reasonably under Probate Code section 16080-16081 and 16202, failing to keep beneficiaries informed under Probate Code 16060, failing to report information upon request under Probate Code section 16061, and failing to provide, annually, statutorily compliant accountings under Probate Code section 16062. Richard's attorney noted that the exigent circumstance necessitating an ex parte application was the fact that after a court proceeding on October 2, 2020, Richard learned "over the weekend, about October 3rd, that the trustees had listed for sale the property located at 730 North G Street in Oxnard, which had previously been allocated by trustees in their own plan for distribution to be distributed to Gary and Rick Callaway."

Richard's attorney noted: "So this came as quite a shock, your Honor, just a few days ahead of trial [on the trustees' petition for instructions regarding their distribution plan for the family trust]." Richard's attorney added that "[t]he next surprise would come the following week at our final [case management conference] when trustees sought to dismiss their petition." Richard's attorney posited that the trustees' changed their distribution plan for the family trust upon receiving an unfavorable decision during the first phase of the bifurcated trial on their petition for instructions. As noted above, in the first phase of the bifurcated trial, the trial court ruled that trust property valuations for

10.

purposes of the distribution plan for the family trust, would be date-of-distribution valuations rather than date-of-death valuations. Consequently, the trustees would have to pay higher prices for any properties they wanted to purchase from the family trust as part of their respective shares of the trust's assets and, in turn, would either need to have or raise the money to be able to do so (including, apparently, by selling the 730 North G Street property).

Richard's attorney stated: "We have no idea what [the trustees'] new plan, if any, for distribution is. We're three-plus years into this with no headway." She added: "[By dismissing their petition for instructions, the trustees] believe that there's now no longer a basis for the lis pendens on the 730 [North G Street] property; and in addition, they still don't believe that they should have to provide any of the documentation concerning the sale, any sort of plan for distribution of what they're going to do with the net sale proceeds, none of it. It's all languishing until they decide if and when and how they wish to buy portions of this trust."

Richard's attorney continued: "And the only way, as I sit here today, that this trust administration is going to end without us seeing your Honor on a monthly or bimonthly basis for the next three months is if a neutral [trustee] comes in, a neutral [trustee] who isn't going to care how much the properties are worth, isn't going to care who buys what from whom or at what price, isn't going to sit on a $50,000 bequest while they distribute very valuable real property to other beneficiaries because they [i.e., a neutral trustee] don't have a stake in it." Richard's attorney concluded: "[I]t just has to be somebody neutral, somebody who is not already a beneficiary, doesn't have a stake in this, and isn't going to make irrational, emotional decisions to withhold information from their siblings and withhold their plans for distribution and make comments like, well, we're the trustees, that's what we can do, it's our discretion."

11.

The attorney for the trustees also made a brief opening statement, stating in part: "[T]he evidence will show [the trustees] filed a 17200 petition seeking instructions on a proposed plan of distribution. The evidence will show that they dismissed that plan after it became apparent that the beneficiaries, the other beneficiaries, did not like the plan." The trustees' attorney added: "The evidence will also show that all of the acts of the trustees have been for the sole benefit of the trust beneficiaries and nothing more."

Richard's counsel called Shelley as the first witness. Shelley testified that she became co-trustee of the family trust, along with Wayne, upon their mother's death in June 2017. In addition, Shelley was sole trustee of the survivor's trust, which role she assumed during her mother's lifetime. Shelley acknowledged her 2018 petition for instructions reflected her request for the court to approve a distribution plan that would allocate one piece of property, specifically 730 North G Street, to Richard and Gary. Shelley acknowledged she had refused Richard and Gary's demand to inspect 730 North G Street. Around October 3, 2020, Shelley and Wayne listed 730 North G Street for sale and on October 9, 2020, Shelley dismissed her petition for instructions.

Shelley testified she now planned to sell 730 North G Street and distribute one half of the proceeds to the survivor's trust (the beneficiaries of which are herself and Wayne only) and the other half to the family trust. Thereafter, Shelley planned to move forward with getting new appraisals for the other four properties held by both trusts, all of which properties (2042 North Ventura Road, 2050 North Ventura Road, 641 Ivywood Drive, and 737 North G Street) are rental-income-producing properties. The new appraisals would be for the purpose of obtaining date-of-distribution valuations, in light of the court's ruling that property valuations should correspond to the date of distribution. The appraisals would be conducted by William King, who had already been hired by the trustees for this purpose.

Richard's counsel asked Shelley: "And when you and your co-trustee, Wayne Callaway, were discussing plans for a new distribution, are you planning on buying out Rick and Gary's interest in any of these properties?" Shelley responded: "We won't know till we see what the appraisals are and how much that's going to be." Shelley testified she would like to buy out Rick and Gary's interest in "all" of the properties if financially possible. Shelley acknowledged that she had made distributions (specifically 9700 Valley Forest Court in Bakersfield) to herself from the survivor's trust in 2019 but had not yet disbursed the $50,000 bequest to Richard even though Richard had requested it and the survivor's trust had sufficient cash to cover such a disbursement. Shelley also acknowledged that she allocated all the attorney fees incurred for trust litigation in 2019 and 2020 to the family trust; she did not allocate any attorney fees to the survivor's trust.

### 4. *Evidentiary Hearing on Richard's Ex Parte Application for Removal (Second Day, October 15, 2020)*

The parties reconvened in court on October 15, 2020, to continue with the evidentiary hearing on Richard's ex parte application for removal of trustees. The court began the proceedings by observing that it had received "another ex parte application," namely Shelley and Wayne's ex parte application to shorten time and motion to expunge the lis pendens on 730 North G Street. The court said it would hear those matters immediately, that very morning, "to get this thing resolved." The court explained: "I mean, the issues are all interrelated. The issue is do you want – you know, do you want to remove the trustees. If we're going to remove them, then they probably shouldn't proceed with the sale. [¶] However, if we're not going to remove them, then there doesn't seem to be a need for a lis pendens. It seems to me we can resolve all of the issues at the same time."

Trustees' counsel then interjected to say that the trustees would "certainly be open if the court was willing to give its blessing for an early distribution of that [$]50,000

13.

[bequest to Richard Callaway from the survivor's trust]." Trustees' counsel added: "We're prepared to pay it today." Richard's counsel added: "It's a rolling ball of surprises and concessions. I mean, that's okay. There is an issue of the interest that I believe has been accruing on it." The court responded, "Well, then, maybe the two of you ought to have a conversation, [both counsel]."

The court reiterated that it would address the issue of the lis pendens that same day but noted it would take a recess to allow the parties to discuss the issues that had been raised. Counsel for the trustees noted that Shelley had brought with her the listing agreement for 730 North G Street. The court suggested, at that point, that "maybe you guys can discuss … how that $585,000 listing price [for 730 North G Street] was arrived at." The court noted that Richard's papers indicated a sale of the property for $590,000 was pending, with a 4.5 percent agent commission. The court stated: "I just would like more information – in deciding that issue, I'd like more information about how the listing price came about and how the sale was conducted or – it hasn't been completed but—" The court pointed out that on June 30, 2017, the property had appraised for $531,000. Thereafter, the court took a recess in order for the parties to meet and confer.

When proceedings reconvened, the court turned to Richard's counsel (given the posture of the matter (the second day of the evidentiary hearing on Richard's ex parte application for removal of the trustees): "It is reported to me that you've reached resolution on some or all of the issues, [counsel]?" Richard's counsel responded that the parties had resolved "all of the issues set for today." Counsel then listed the terms of the agreement reached by the parties. Counsel stated that the trustees would pay Richard Callaway $57,000 (the $50,000 bequest plus $7,000 in interest) that day, to satisfy the specific bequest to him from his mother (in the Sixth Amendment to the survivor's trust). Counsel stated that "in exchange," Richard would "withdraw the pending application for

14.

ex parte [that is, the removal application]" and also "voluntarily release the lis pendens." Counsel added, "in exchange for that, trustees will close the sale [on 730 North G Street] that's now pending." Counsel noted: "Once [the sale of 730 North G Street] is closed, 50 percent of those net proceeds will be deposited into the survivor's trust; 50 percent of those net proceeds will be allocated to the [family] trust." From the funds deposited in the family trust, payments of $40,000 would be disbursed to each of the four beneficiaries (the funds deposited in the survivor's trust did not concern Richard and Gary). Finally, all counsel "agreed to circulate the names of professional mediators and schedule this whole matter for professional mediation." Richard's counsel also confirmed: "[M]y client is going to keep the [noticed] petition for removal … on calendar."

Richard's counsel added: "Hopefully we will have mediated by then. If we have not, we will work to continue it as may need be or whatever that case may be at that time. But we all are going to work in good faith to get a mediation date. They're going to complete – trustees are going to complete their … updated appraisals [of the four remaining properties]." Counsel wrapped up: "And then with all of that information we'll go into professional mediation ahead of any hearing on the [noticed] petition for removal." The court responded: "Okay. I really like this agreement. I think this is good."

The court then made a careful record by reiterating the entire agreement on the record. The court ordered the trustees to issue a check in the amount of $57,000 to Richard Callaway that day. The court stated that Richard would "make every effort – every reasonable effort to release the lis pendens tomorrow, Friday, October 16th, 2020" and that the trustees were authorized to thereafter proceed with the sale of 730 North G Street. The court continued that "once the sale is completed, … 50 percent of the net sale proceeds will go to the survivor's trust, 50 percent of the net sale proceeds will got to the

15.

marital/family trust, then from that marital/family trust there will be a preliminary distribution [of $40,000] to each of the four beneficiaries, Richard Callaway, Gary Callaway, Wayne Callaway, and Shelley Trunick."

The court added: "The attorneys will circulate names amongst themselves of a professional mediator and make every reasonable effort to schedule a professional mediation before the next date in this matter of December 17, 2020." The court ordered the trustees to complete the appraisals of "the four remaining properties of the trust." The court ordered: "This should be completed within 30 days [and] circulated within 30 days. So 30 days would be November 16, 2020; that's a Monday. All right. November 16, 2020. The appraisal[s] should be circulated to the counsel for Gary Callaway and Richard Callaway, but the trustees will hire and direct the appraiser." The court turned to the trustees' counsel and asked, "That's the agreement; correct?" Trustees' counsel confirmed: "Correct." The court ensured that every party and party's counsel (including Shelley and Wayne and their counsel) individually affirmed, on the record, his or her consent to the agreement. The court concluded the proceeding: "All right. Then we will return to court on December 17, 2020, for further hearing on the new [properly noticed] petition [for removal]."

### 5. *Events Leading Up to the Trial On Richard's Petition for Removal of Trustees*

On October 22, 2020, Richard's counsel requested trustees' counsel to provide a copy of the closing statement for the sale of 730 North G Street "so that we can confirm the sale is consistent with the representations made to the Court." Trustees' counsel responded that neither Richard nor Gary "are sellers" and "neither of them is entitled to a copy." Richard's counsel replied: "You can't seriously think that beneficiaries of the Trust are not entitled to the closing statement for this sale after all that we have been through? It is a reasonable request under Probate Code section 16061 – just as receiving

16.

a copy of the listing agreement was a reasonable request when it, too, was ignored until we were in court." Trustees' counsel answered: "I do seriously object to providing a copy of the closing statement and do not think that the probate code requires that you receive a copy." Richard's attorney responded she had provided to the escrow office the notarized release of lis pendens but that trustee's counsel was "preventing [recordation of the withdrawal of lis pendens] because you do not want to share a copy of the closing statement or clarify when distributions will be made if they are not being made out of escrow as they should be." Trustees' attorney ultimately agreed to provide the sellers' closing statement.

On November 2, 2020, Shelley and Wayne filed and served a notice of sale of 730 North G Street. The notice clarified that the sales price was reduced from $590,000 to $570,000 owing to requisite repair and remediation work revealed during the home inspection process. The notice reflected net sale proceeds in the amount of $539,789.95. The notice stated that $269,894.98 and $269,894.97 were deposited in the family trust and the survivor's trust, respectively. Also on November 2, 2020, Shelley and Wayne sent checks in the amount of $40,000 each to Gary and Richard, representing their respective partial distributions under the parties' agreement. Gary and Richard did not, however, receive, by the November 16, 2020 deadline, the appraisals for the remaining four properties that were jointly held by the family trust and the survivor's trust.

Accordingly, on December 9, 2020, in order to properly prepare for the mediation contemplated in the parties' agreement, Gary's counsel requested copies of the appraisals from trustees' counsel. Shelley and Wayne's counsel responded to attorneys for Richard and Gary, respectively, by letter dated December 11, 2020. The letter stated: "Co-Trustees of the Callaway Family Trust have transferred title of each property to themselves and, based upon [the] date of distribution appraisals, have concurrently

transferred cash to the Callaway Family Trust in an amount necessary to assure that each of your clients will receive a cash distribution equal to their proportionate share of each of the three properties which were appraised." The letter further acknowledged Richard's and Gary's interests in *737* North G Street, noting that a "separate $20,000 payment" applied to those interests.

The letter noted: "*At such time* as your respective clients are in a position to sign a receipt acknowledging that the cash being allocated to each of them for their proportionate share or each of the three properties is correct, the Trustees will distribute their share of the Callaway Family Trust allocable to these properties and the 737 North G Street Property." (Italics added.) The letter also stated that additional funds owed to Richard and Gary "will be held for further administrative purposes and to pay additional attorney's fees that will be incurred if your clients choose to continue pursuing claims against the Trustees." The letter also attached "date of distribution appraisals for [three of] the properties held in the Callaway Family Trust," namely the Ivywood Drive property and the two properties on North Ventura Road.

Richard's attorney responded by email to trustees' counsel that same day (December 11, 2020): "Please re-read the transcript where we placed our stipulation on the record before the Judge. There is no agreement that co-trustees were to transfer title to the property to themselves, or that Rick and Gary would blindly accept the appraisals that trustees obtained. We are heading into mediation next week to address these issues. Please provide copies of any deeds trustees executed concerning the properties since our stipulated agreement on how to move forward was placed on the record 10/15/2020."

The parties met for the planned mediation on December 16, 2020; the mediation was unsuccessful. The following day, Richard's counsel again requested, by email, documents including the appraisal obtained by co-trustees for 737 North G Street and

18.

copies of deeds and documents concerning the transfer by trustees of real property to themselves. Trustees' counsel provided the appraisal for 737 North G Street following the mediation. However, with regard to the other documents concerning the properties trustees had transferred to themselves, trustees' counsel responded that the documents in question were "equally available to [Richard] from the Ventura County Recorder's Office," and trustees were "not require[d]" to "provide you with documents to which you have equal access."

For his part, Richard filed on December 16, 2020, a supplement to his removal petition and a request to void co-trustees unauthorized transfer of trust properties to themselves. More specifically, Richard's supplemental papers alleged that Shelley and Wayne "unilaterally transferred property out of trust to themselves without notice to or consent by Rick or Gary." (Underlining omitted.) The papers added: "Without sharing appraisals or providing Rick or Gary any opportunity to independently review their appraisals … Co-Trustees 'sold' rental income producing trust properties to themselves for a number they decided. Co-Trustees must be removed. These transactions are void, and must be unwound." Richard's supplement further alleged that Shelley and Wayne did not timely provide the appraisals prepared by William King for the trust properties, contrary to the parties' agreement.

On January 19, 2021, Shelley filed a motion to strike, as well as demurrers, as to Richard's removal petition as supplemented. On January 20, 2021, Shelley filed an objection/opposition to Richard's removal petition (the parties stipulated that the objection would serve as an objection to the original petition and to the supplement). The court issued, on March 1, 2021 (or March 15, 2021), an order on Shelley's motion to strike (the court's order is not included in the record on appeal).

On February 17, 2021, Richard filed a notice of trustees' noncompliance with stipulated order [i.e., the parties' agreement] and additional unauthorized transfers of trust real property. The notice of noncompliance was supported by the declaration of Richard's counsel. The notice stated that Shelley and Wayne had "failed to comply with the terms of the stipulated order entered on the record during proceedings herein held on October 15, 2020, and executed a series of deeds purportedly transferring rental income producing real property titled in the name of the Trust to [themselves] on November 16, 2020, without notice to [Richard] or beneficiary [Gary] and while [Richard's] petition to remove Trustees for breach of fiduciary duty was set for hearing on December 17, 2020." The notice added: "The purported transfer deeds were recorded December 3, 2020, approximately two weeks before the parties' scheduled mediation before the Honorable Howard R. Broadman (Ret.)."

The notice of noncompliance filed by Richard noted that the new appraisals of the properties were all dated October 13, 2020, but the trustees failed to provide the appraisals to Richard and Gary by the November 16, 2020 deadline set by the court for them to do so. The notice of noncompliance further noted: "Instead of circulating [the] appraisals as ordered by November 16, 2020, Trustees spent the day of November 16th executing approximately 18 quitclaim deeds transferring the properties to themselves (copies of the deeds were attached to the notice of noncompliance). Trustees circulated 3 of the 4 appraisals on December 11, 2020, just 5 days prior to mediation, and approximately 2 months after the appraisals were completed. The final appraisal was provided two days after mediation, December 18, 2020."

The notice of noncompliance also noted that the trustees had not informed Richard and Gary about price reductions in the sale price of 730 North G Street, had failed to

20.

provide the listing agreement despite numerous requests, and had refused to provide the sellers' closing statement, among other things.

On March 24, 2021, Richard filed an amended petition for removal (amended petition or amended petition for removal). Gary filed a notice of joinder as to Richard's amended petition. The record does not reflect any objection filed by Shelley.

On April 6, 2021, Shelley and Wayne filed a petition for approval of [trustee] accounting (accounting) for the period from June 30, 2017 through December 31, 2020. Richard filed his objection to the accounting on October 4, 2021, to the effect that the values assigned to the trust properties were undervalued; the accounting was inappropriately limited as it "only provid[ed] information through December 2020"; and the trustees' request for attorney fees was not properly documented.

On October 20, 2021, the trial court consolidated Richard's amended petition for removal and the trustees' petition for approval of accounting for trial purposes, with the combined trial to begin on November 1, 2021.

### 6. Combined Trial on Richard's Petition for Removal of Trustees and Trustees' Petition for Approval of Accounting (November 1-4, 2021)

The combined trial on Richard's amended petition for removal of trustees and trustees' petition for approval of accounting took place over four days, November 1-4, 2021.

In a trial brief filed on October 26, 2021, Richard noted that the trial concerned (1) Richard's petition and request for removal of Shelley and Wayne as trustees, "*as supplemented and amended following Court Order*";[7] and (2) the validity of the trustees'

---

[7] The court order at issue appears to be the trial court's order on trustees' motion to strike. The register of actions in the record on appeal shows that in March 2021, the trial court issued a "Ruling/Order on Motion to Strike Filed by Co-Trustees Wayne Callaway and Shell[e]y Trunick; Heretofore Submitted On 02/18/2021." (Some capitalization omitted.) The register of actions states an eight-page ruling was mailed to

accounting filed April 6, 2021.  (Italics added.)  In his trial brief, Richard contended the trustees should be removed as trustees of the family trust, with a neutral trustee appointed in their place, for breach of fiduciary duties.  Richard further contended that Shelley and Wayne should be surcharged against their interest in the trust, for payment of Richard's attorneys' fees and costs.  Finally, Richard contended the trustees' accounting should be denied in full.

Richard's trial brief noted:  "Rick had to file a petition in this Court just to have a $50,000 specific bequest distributed to him after Trustees withheld it for over three (3) years.  Similarly, it was only through litigation that Rick and Gary learned of Trustees' unilateral sale of real property that had been designated by Trustees for distribution outright to Rick and Gary, equally."  The trial brief stated:  "Meanwhile, Trustees quitclaimed all remaining Trust real property to themselves individually without notice or consent of Rick or Gary who were waiting on Trustees' appraisals for said properties to prepare for the scheduled mediation they hoped would resolve this protracted administration.  Instead, they learned just days prior to the scheduled mediation that Trustees had already transferred the properties to themselves – and they were told to obtain copies of those transfer deeds from the County Recorder when they, as beneficiaries, requested copies."

Richard's trial brief added:  "Heading into the fifth (5th) year of Trust administration, there is no end in sight.  After spending hundreds of thousands of dollars from the Trust on attorneys' fees and costs to advance Trustees' sole interests based on

all parties.  However, neither the co-trustees' motion to strike, nor the court's ruling thereon appear in the record.  Although the co-trustees' motion to strike and the court's ruling thereon are mentioned in the appellants' opening brief, the citations provided simply go to the register of actions, which only reflects a summary reference.

their unique interpretation of the Trust document and trust principles, one [phase of a] bifurcated trial concluded, a second phase of trial canceled by Trustees' 11th hour petition withdrawal, unilateral sales, *reneged terms of a partial settlement*, numerous appraisals of appreciating assets, demurrers, motions to strike, two evidentiary hearings, one writ and a second writ threatened, and while Trustees continue to argue they can, essentially, do what they want with the Trust assets … it is time they be removed."[8]

As for trustees' trial brief, filed on October 26, 2021, it stated upfront: "Wayne Callaway and Shelley Trunick … submit their trial brief to address the claims set forth in Richard Callaway's … Petition for Removal of Trustees, as '*Supplemented*,' and [Richard's] Objections to Trustees' Accounting." (Italics added.) The trustees' trial brief stated: "On or around December 3, 2020, Trustees, pursuant to the powers granted to trustees of the Trust and under Article X, subdivision H of the Trust, purchased the undivided interests the Family Trust held in the Properties at appraised value based upon Mr. King's appraisals and transferred the properties to themselves. At the same time, similar transfers were made by Shelley Trunick as Trustee of the Survivor's Trust to … Wayne and Shelley of their respective Survivor's Trust interests in the Properties." The trustees' trial brief continued: "Concurrently with the transfer of each property interest from the Family Trust to Trustees, Trustees delivered an equal amount of cash to the Family Trust as the Trustees' purchase price paid, less a certain sum retained for ongoing

---

[8] Richard's trial brief also noted: "It is undisputed that Trustees failed to make specific Trust real property productive as required by Probate Code section 16007. For unknown reasons, Trustees allowed 730 'N' G Street to sit vacant, in disrepair, storing personal property that was allocated solely to Trustees since June 30, 2017 until they unilaterally sold the property without notice to Rick or Gary in October 2020. Each and every other Trust real property is rental income producing, except for the real property Trustees sought to allocate to Rick and Gary, while keeping the income producing properties for themselves. This is yet another failure of Trustees and breach of their fiduciary duty."

trust administration, and delivered [Richard] and Gary their residual share in the form of cashiers checks." The trustees' trial brief added: "The net result of these transfers and allocations was that Trustees each received real property having a total appraised value equal to the amount of cash allocated to [Richard] and Gary."

### 7. *Evidence Adduced at the Trial on Richard's Removal Petition and Trustees' Accounting*

At the outset of the trial, the trial court heard the parties' motions in limine. Trustees' moved in limine to exclude the testimony of a real estate appraiser who Richard had designated as an expert witness. On June 28, 2021, Richard and the appraiser had conducted an inspection of trust properties for purposes of preparing appraisals of the trust properties.[9] Richard's trial brief noted the appraisals came in at "hundreds of thousands of dollars over Trustees' asserted value."[10] Trustees' moved to exclude Richard's expert appraiser and the appraisals he had prepared, on grounds that Richard's counsel had not timely submitted an expert witness declaration and had failed to timely produce the expert's report. The trial court excluded Richard's expert appraiser "for failure to comply with the Civil Discovery Act."

---

[9] Richard's inspection of the trust properties came about after he filed a motion to compel inspection of each of the four remaining trust properties, for purposes of obtaining appraisals. After a hearing on May 27, 2021, the court granted on June 10, 2021, Richard's motion to compel inspection and ordered trustees to pay discovery sanctions.

[10] More specifically, Richard's trial brief stated: "Petitioner has … obtained appraisals for the Trust real property improperly transferred to Trustees, and the evidence at trial (through expert testimony of Petitioner's appraiser) will demonstrate that Trustees distributed the real properties, not only without proper notice or consent and while Rick and Gary were operating with the good faith expectation that [distribution of] these properties were to be resolved at the then-scheduled professional mediation, but at significantly lower than market value for each property and especially for the income producing rental complex[es] which appraised for hundreds of thousands of dollars over Trustees' asserted value."

At the suggestion of counsel for the trustees, the parties agreed to consolidate the trial on the two petitions before the court for all purposes, "given the amount of overlap and to avoid cumulative testimony coming in and for the preservation of judicial resources." The parties agreed "to get everything done in one shot." Three witnesses testified at the trial: Shelley, Richard, and William King (the trustees' appraiser).

***Testimony of Shelley Trunick***

Shelley testified that each of the beneficiaries of the family trust received an equal 25 percent of the trust assets, based on date-of-distribution appraisals. Gary and Richard got monetary distributions, while Shelley and Wayne got real property. Shelley held back $75,000 from each of the respective shares of Gary and Richard for trust administration purposes. Shelley did not hold back any funds from her share or that of Wayne, because their shares consisted of real property. Gary and Richard were provided cashier's checks for their respective shares of the family trust (minus the $75,000 holdbacks); however, Gary and Richard had not cashed the checks to date.

Shelley testified that William King was hired in early October 2020 to conduct the date-of-distribution appraisals; Shelley did not notify Gary and Richard of the hiring of King. The trustees used the appraisals "to develop our buyout plan to buy out [Gary and Richard's] fractional interest in the property." Shelley was questioned about the parties' in-court settlement agreement of October 15, 2020, in which the trustees had agreed to obtain and circulate new date-of-distribution appraisals by November 16, 2020. Shelley responded she forwarded the appraisals to her attorneys but did not know whether and when they were circulated to Gary and Richard. Shelley testified that around November 16, 2020, "[w]e were at the point then we were trying to get the funds divided out[,] [s]o I didn't know when exactly that my attorneys circulated [the appraisals] to them or not."

Shelley was asked whether she told Richard and Gary that she and Wayne were actually transferring trust properties to themselves. Shelley noted that the possibility of this option was discussed at the court hearing on October 14, 2020, on Richard's ex parte removal application, *prior to* the parties' settlement agreement of October 15, 2020. The transcripts of the court hearings on October 14, 2020 (when Shelley said she would like to buy the properties but did not know whether she could afford to do so) and October 15, 2020 (which reflected the parties *subsequent* in-court settlement agreement) were admitted into evidence.

As for 730 North G Street, the trustees sold it, with 50 percent of the net proceeds going to the survivor's trust and the other 50 percent going to the family trust (the beneficiaries of the family trust received $40,000 each). Shelley did not know whether the ultimate reduction in the sales price of 730 North G Street was communicated to Gary and Richard. Shelley testified the sellers' final closing statement for 730 North G Street was eventually provided to Gary and Richard.

Shelley acknowledged the trustees initially refused Richard's request to inspect *737* North G Street. Shelley testified the trustees did not consider 737 North G Street to be an asset of the family trust until a later point. She did not know when the trustees realized that a portion of 737 North G Street was held by the family trust and did not know whether the trustees took any steps to notify Richard and Gary after the fact.

Shelley testified that the accounting for the family trust reflected a total expenditure on attorneys' fees for the account period (from June 30, 2017 to December 31, 2020) of $206,000. The trustees spent $108,000 between March 2018 (when the trustees' initial distribution plan was proposed to Richard and Gary in a letter from the trustees' attorney) and March 17, 2020 (the date of the ruling on the trustees' petition for instructions regarding the proposed distribution plan) defending their initial distribution

26.

plan (under which Gary and Richard would have received 730 North G Street). Shelley noted the trustees withdrew their original distribution plan on October 9, 2020.

***Testimony of William King***

William King appraised four properties on behalf of the trustees on October 13, 2020. The appraised value of 641 Ivywood Drive was $575,000; 737 North G Street appraised at $480,000; 2042 North Ventura Road appraised at $920,000; and 2050 North Ventura Road appraised at $920,000. The testimony of the appraiser utilized by Richard to appraise the same properties, along with his appraisals, was excluded by the trial court.

***Testimony of Richard Callaway***

Richard wanted to receive the 730 North G Street property from the trust, but disputed the value assigned to that property by the trustees. On account of the disputed valuation and the fact the property needed repairs, Richard had declined the terms of the trustees' offer regarding 730 North G Street. To his surprise, Richard saw on the internet that the trustees had listed 730 North G Street for sale; he was not informed beforehand by the trustees. Richard wanted to receive, as part of his share of the family trust, some of the real property in that trust. As for the $50,000 specific cash bequest to him from the survivor's trust, Richard had asked the trustees numerous times for distribution of that bequest, to no avail.

Richard remembered the in-court settlement agreement reached between all parties in late 2020. Richard understood that under the agreement he would receive appraisals on the remaining four properties (that is, all the properties with the exception of 730 North G Street (which was sold in October 2020)) from the trustees by November 16, 2020. Richard had requested mediation on the issue of the valuation of the properties. Richard understood that under the settlement agreement, he would receive the trustees' appraisals ahead of the mediation. Richard expected to review, ahead of the mediation,

27.

the trustees' appraisals with his own appraiser. However, on the day of the mediation, Richard was informed that the trustees had already sold the properties to themselves. Richard testified: "Never thought that would ever happen."

Richard did not believe the appraisals eventually provided by the trustees were fair. Richard had to fight to be able to have access to the trust properties by his own appraiser and inspector. Richard opined that the correct valuation of 2042 North Ventura Road and 2050 North Ventura Road was $1,350,000 for each property.

### 8. *Trial Court's Ruling After Trial on Richard's Removal Petition*

On April 28, 2022, the trial court issued a tentative decision and order the amended petition for removal of co-trustees. The court granted the parties 10 days to raise any controverted issues or make proposals not included in the tentative decision. After the parties filed responses to the tentative decision, the trial court, on June 1, 2022, issued a modified tentative decision. Richard filed a response to the modified tentative decision and on July 19, 2022, the trial court issued a further modified tentative decision on the amended petition. Although trustees subsequently filed, on August 8, 2022, a response to the third tentative decision, the trial court declined to further modify its decision. Specifically, on August 31, 2022, the court made the following findings and orders: "[T]he order entered on 07/19/2022 is the statement of decision of the Court. The Court finds that Richard S. Callaway is the prevailing party."

We will briefly summarize the trial court's detailed and thorough statement of decision on Richard's amended removal petition. The trial court found that trustees breached their fiduciary duties to the family trust and its beneficiaries, Richard and Gary, in three ways. First, trustees breached the duty to give the beneficiaries complete and accurate information relative to the trust and the administration of the trust, both by their initial refusal to provide information to Richard, especially records related to 730 North

28.

G Street, and then by their decision to repudiate the October 15, 2020 settlement agreement by "simply acquiring all of the trust properties and buying out the non-trustee beneficiaries' interests therein."

Second, trustees breached the duty to deal impartially with all beneficiaries by self-dealing "to the extent that they believe themselves to be free of any obligation to consider the rights of any other beneficiaries to receive property of the Family Trust estate in any form other than that decided upon solely by the co-trustees in furtherance of their self-serving interests."

Third, trustees breached their duty of undivided loyalty to beneficiaries by repudiating the settlement agreement and concealing their intent to not perform it.

The court, however, declined to surcharge trustees for failing to make the 730 North G Street property productive.

The court concluded that the trustees' breach of fiduciary duties, especially their "actions in repudiating the in-court agreement of October 15, 2020, and proceeding in a manner contrary to such agreement, without any further discussion or advance notice to the objecting beneficiaries," called for "the removal of the co-trustees for the preservation of the Family Trust estate and to prevent further injury to the beneficiaries of the Family Trust." The court ordered "the appointment of a neutral fiduciary to administer the Family Trust estate and provide for the final distribution of the Family Trust assets in accordance with the intent of the settlors as expressed in the trust instrument."

In addition, the court found that "the co-trustees unilateral repudiation of the October 15, 2020, in-court agreement to mediate 'the whole matter' … was an extreme act of misconduct and constitutes a breach of trust on the part of the co-trustees and a breach of co-trustees' fiduciary duties." The court ordered Shelley and Wayne to convey back to the family trust their respective interests in trust properties and ordered Richard

and Gary to return the equalization payments sent to them by trustees. Finally, the court awarded attorneys' fees and costs to Richard.

Trustees appealed.

### 9. *Trial Court's Ruling After Trial on Trustees' Petition to Approve Accounting*

On April 28, 2022, the trial court issued a tentative decision and order on petition for approval of accounting. The court largely approved the trustees' accounting with the exception, as relevant here, of a portion of the attorneys' fees payments listed by trustees.

The court stated in the decision: "The court finds that the co-trustees' attorney's fees incurred and paid from the [family trust] during the period from the beginning of the account period [i.e., June 30, 2017] up to the end of September, 2020, were reasonable for the work undertaken and the complexity of the issues presented and are therefore chargeable to the Trust and were required for the administration of the [family trust]."

Next the court addressed attorneys' fees incurred from October 2020 to the end of the account period, that is December 31, 2020. The court found that "the co-trustees' actions in unilaterally repudiating the in-court agreement of October 15, 2020, and proceeding in a manner contrary to such agreement, without any further discussion or advance notice to the non-trustee beneficiaries, was an extreme act of misconduct undertaken in bad faith and constituted a breach of the co-trustees' fiduciary duties."

The court added: "[T]he attorney's fees incurred after September, 2020 to the end of 2020, should not be charged to the Trust estate. The amounts paid for such services shall be surcharged back against the co-trustees' distributive shares." The court concluded: "To that end, the accounting reflects attorney's fees paid from October, 2020 through December, 2020 at $71,199.70. Because there were no billing statements provided, or detailed declarations delineating the specific matters in which these fees were incurred[,] the court is disallowing the amounts paid for October, November, and

30.

December, 2020 on the grounds that the co-trustees did not provide sufficient evidence that the fees were incurred for the benefit of the Trust and that the actions of the co-trustees during that period were in violation of the co-trustees['] duties and in breach of the trust."

Finally, as to the valuation assigned to the trust properties in the trustees' accounting, the court considered the trial testimony of William King, as well as Richard's testimony regarding the value of the two properties on North Ventura Road. With regard to the trustees' petition for approval of accounting, the court noted: "This court is tasked with determining which value to use for these properties, *at least for purposes of determining whether or not to approve the accounting submitted by the co-trustees*." (Italics added.) For purposes of approving the accounting, the court found that "the values listed in the co-trustees' accounting accurately reflect the fair market value of the subject property at the time of the written appraisals submitted by Mr. King." Trustees' counsel did not request or obtain a finding by the court as to the fair market value of the trust properties for all purposes or for purposes of Richard's amended removal petition.

The court ultimately adopted, on June 1, 2022, its tentative decision as its statement of decision on trustees' petition for approval of accounting. Trustees appealed.

## DISCUSSION

### I. Trial Court's Decision Did Not Violate Trustees' Procedural Due Process Rights

Trustees' claims on appeal largely relate to the court's decision on Richard's amended removal petition. Trustees first argue that the court violated their procedural due process rights, to the extent it "largely based its decision to remove Appellants as co-trustees on what it perceived to be the Appellants' breach of the Settlement Agreement and refusal 'to *meaningfully* participate in any mediation to resolve "the whole matter." ' " Trustees contend "[n]one of the charging allegations contained in the

31.

Amended Petition remotely relate to the Settlement Agreement [and/or] Appellants' purported breach thereof." Trustees continue: "What is more, there was not a scintilla of testimony received at trial related to the parties['] mediation, and any attempts by Respondents to explore what transpired at mediation was blocked by timely objections by Appellants which were sustained by the trial court." We reject the trustees contentions for multiple reasons, as discussed below.

Richard filed his initial noticed petition for removal of trustees for violation of several fiduciary duties, on October 13, 2020. Thereafter, when the trustees transferred the four remaining trust properties to themselves, Richard filed, on December 16, 2020, a supplement to his removal petition and a request to void co-trustees unauthorized transfer of trust properties to themselves. Next, on February 17, 2021, Richard filed a notice of trustees' noncompliance with stipulated order and additional unauthorized transfers of trust real property. The supplement to the removal petition and the notice of noncompliance detailed the actions taken by trustees that the trial court ultimately found were in violation of the October 15, 2020 settlement agreement.

On January 19, 2021, trustees filed a motion to strike as to Richard's removal petition as supplemented. The register of actions in the record on appeal shows that in March 2021, the trial court issued an eight-page ruling on the motion to strike. However, neither the trustees' motion to strike, nor the court's ruling thereon appear in the record. (See footnote 7 *ante*.) Based on the court's ruling, on March 24, 2021, Richard filed an amended removal petition alleging various breaches of fiduciary duty by the trustees.

On October 26, 2021, prior to the trial on the removal petition, Richard filed a trial brief. The trial brief noted that the then-upcoming trial concerned Richard's petition and request for removal of Shelley and Wayne as trustees, "*as supplemented and amended following Court Order.*" (Italics added.) Trustees also filed a trial brief, which similarly

noted that the operative pleading for trial purposes was Richard's petition as " '[*s*]*upplemented*.' " (Italics added.) This record suggests that the operative pleading was Richard's removal petition, as supplemented and amended. Given the incomplete record, at a minimum, trustees have not shown that the operative pleading was Richard's amended petition for removal, standing alone. To the extent, Richard's supplement was part of the operative pleading, it clearly put trustees on notice that their actions in relation to the settlement agreement were at issue at trial.

Even assuming the operative pleading was Richard's amended petition for removal standing alone, the trustees had adequate notice that their actions in relation to the settlement agreement were at issue with respect to the breaches of fiduciary duties alleged therein. Richard's trial brief specifically referenced the settlement agreement, noting that trustees should be removed, among other reasons, because they had engaged in "unilateral sales" and "reneged [on the] terms of a partial settlement," and simply did "what they want[ed] with the Trust assets."

In addition, the evidence adduced at trial encompassed the settlement agreement, its terms, and breach of its terms. The transcript of the October 15, 2020 hearing—during which the parties reached the settlement agreement and its terms were expressly placed on the record—was admitted into evidence as Exhibit 36. During trial, trustees' counsel questioned Shelley with respect to Exhibit 36, and Shelley, acknowledging she was in court on October 15, 2020, referred to the agreement and stated the trial court, in connection with the agreement, had ordered the trustees to obtain updated property appraisals in advance of the parties' agreed-upon mediation. Shelley confirmed, "I know we reached a resolution." The court thereupon, without objection, took judicial notice of the fact that the updated appraisals were required by the parties' settlement agreement (not ordered by the court).

33.

Shelley was also asked about another term of the parties' agreement, namely that the trustees were required to circulate the updated appraisals to Richard and Gary by November 16, 2020. When asked whether she had complied with that term of the parties' agreement, Shelley testified, "I don't circulate anything." Shelley testified she had forwarded the updated appraisals to her attorneys but was unaware whether or when they were passed on to Gary and Richard.

Richard also testified that the trustees' actions following the in-court settlement violated the terms of the agreement. Specifically, he testified the trustees' failure to timely share the updated property appraisals with him and their unilateral transfer of the trust properties to themselves, blindsided him (given the terms of the agreement). Richard indicated the trustees' actions effectively gutted or mooted the parties' agreed-upon mediation when it subsequently occurred.[11] The trustees' argument that there was no testimony regarding what transpired at the mediation misses the mark.

Finally, trustees' argument that the trial court's reliance on trustees' breach of the settlement agreement *violated trustees' procedural due process rights* is forfeited on appeal, because the trustees' did not object, on the basis of a due process violation, at any point when evidence related to the agreement was elicited. On the contrary, trustees' counsel himself questioned Shelley with respect to the settlement. Furthermore, trustees did not object, on the basis of violation of due process, to the trial court's tentative decision. In the trial court, the trustees merely objected on grounds there is no evidence to suggest the trustees breached the October 2020 agreement or decided not to

[11] The trial court's decision noted: "The purpose of the mediation was to resolve the remaining issues [regarding the distribution of trust assets] among the parties. The mediation would allow for meaningful input from all parties as to what each was looking for in the valuation of the properties and the ultimate distribution of the estate." The trustees' unilateral transfer of the trust properties to themselves amounted to an end run around the agreed-upon mediation.

meaningfully participate in any mediation to resolve the entire matter. Since trustees present a procedural due process argument for the first time on appeal, it is forfeited. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 912 "[[W]hen a trial court announces a tentative decision, a party who failed to bring any deficiencies or omissions therein to the trial court's attention forfeits the right to raise such defects or omissions on appeal."]; *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 [" 'Failure to raise specific challenges in the trial court forfeits the claim on appeal.' "].)

## II.    Trial Court's Decision to Remove Trustees Was Not Erroneous

Trustees next argue that the trial court "erred in removing appellants as co-trustees of the family trust on the basis that appellants did not administer the trust according to its terms [and/or] that they abused their discretionary powers to the detriment of respondents." (Capitalization omitted.) Trustees further contend: "The trial court's finding that appellants breached their duties of loyalty, impartiality[,] and to avoid conflicts of interest is unsustainable because the settlors expressly sanctioned appellant's conduct of purchasing the family trust's assets." (Capitalization omitted.) Trustees add: "The trial court's determination that appellants breached their general duty to report is not supported by the evidence." (Capitalization omitted.)

We review the trial court's decision to remove a trustee under the deferential abuse of discretion standard, and we do not interfere with that decision unless the trial court has clearly abused its discretion. (*Estate of Effron* (1981) 117 Cal.App.3d 915, 930; *Estate of Gilmaker* (1962) 57 Cal. 2d 627, 633 ["The removal and substitution of a trustee is largely within the discretion of the trial court."].) We apply the substantial evidence standard of review to the trial court's determinations as to whether a trustee

35.

breached a fiduciary duty, and to the underlying factual findings required in making such determinations. (*Briano v. Rubio* (1996) 46 Cal.App.4th 1167, 1172-1173.)

The de novo standard of review "applies to questions of statutory construction [citation] and to the interpretation of written instruments, including a trust instrument, unless the interpretation depends on the competence or credibility of extrinsic evidence or a conflict in that evidence." (*Pena v. Dey* (2019) 39 Cal.App.5th 546, 551, overruled on other grounds by *Haggerty v. Thornton* (2024) 15 Cal.5th 729, 735; *Burch v. George* (1994) 7 Cal.4th 246, 254.) Where, as here, we do not rely on conflicting extrinsic evidence, the interpretation of a trust agreement is a legal question we review de novo. (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439.)

We reject trustees' contentions and affirm the trial court's removal of trustees.

## A. Duty to Report

We will first address the court's determinations as to the duty to report. In this regard the trial court observed that under Probate Code section 16060, "trustees had a duty to keep the beneficiaries of the trust reasonably informed of the trust and its administration." (See *Strauss v. Superior Court* (1950) 36 Cal.2d 396, 401 (*Strauss*) ["A trustee has the duty to the beneficiaries to give them upon their request at reasonable times complete and accurate information relative to the administration of the trust."].) Quoting *Strauss* at pages 401-402, the trial court explained that "the trustee's records as to the administration of the trust are deemed a part of the trust estate, and the right of beneficiaries to an inspection of them stems from their common interest in the property along with the trustee." The court noted that under *Strauss*, "Richard, because of his special interest as a beneficiary of the Family Trust has as much right to inspect records pertaining to the sale of property of the Family Trust as do the Co-trustees."

36.

The court observed that, nonetheless, "it appears that the Co-trustees dispute Richard's right to pertinent information concerning trust administration." The court continued: "For example, Co-trustees initially asserted that Richard had no right to review the records relating to the sale of the Family Trust property located at 730 North G Street, Oxnard, CA and belatedly provided such information only to obtain the withdrawal of the lis pendens on the property." The court stated: "The Co-Trustees' position was at loggerheads with … the California Supreme Court's holding in *Strauss*." The court found, "the Co-trustees initial refusal to provide such information was a breach of their fiduciary duty as trustees and constituted [a] breach of trust."

The court further determined: "The same is true of the co-trustees decision to repudiate the in-court agreement of October 15, 2020, in favor of the co-trustees' simply acquiring all of the trust properties and buying out the non-trustee beneficiaries' interests therein." The court concluded: "These actions were in breach of the co-trustees' fiduciary duty to inform the other beneficiaries of the trust." The court's conclusions with respect to trustees' breach of the duty to report are sound and amply supported by the evidence. We decline to disturb them.

### B. Duties of Impartiality and Loyalty

Here, with respect to the duty of impartiality, the trial court observed: "When a trust has more than one beneficiary, the trustee has a duty to deal impartially with each and must act impartially in investing and managing the trust assets, taking into account any differing interest of the beneficiaries." (Prob. Code, § 16003; *Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1208 [trustee must exercise any discretion in good faith and cannot treat beneficiaries differently based on animus, bad faith, or other improper motives].) The trial court also noted: "The most practical way for a trustee to avoid a breach of the fiduciary duty to deal impartially with trust beneficiaries is to obtain the

37.

consent of the beneficiaries to issues such as the valuation of assets and division of distributions thereof." (See Hartog and Kovar, Matthew Bender Practice Guide: California Trust Litigation, § 10.06.)

The trial court recognized that in this instance, the trust instrument empowered the trustees to purchase trust property in the exercise of their discretion (see below). (See Trust Article X, paragraph H.) However, the court observed: "It appears in this case that the Co-Trustees have asserted their discretionary authority to the extent that they believe themselves to be free of any obligation to consider the rights of any other beneficiaries to receive property of the Family Trust estate in any form other than that decided upon solely by the co-trustees in furtherance of their self-serving interests. This sort of self-dealing constitutes another breach of the Co-trustees' fiduciary duties, the duty to deal impartially with the beneficiaries of the trust [under] Probate Code [section] 16003."

As for the duty of loyalty, the trial court noted that a "trustee may not obtain any advantage over a beneficiary by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." (See *Jones v. Stubbs* (1955) 136 Cal.App.2d 490, 500.) The trial court reiterated that in this case, "the co-trustees unilaterally and without notice to the non-trustee beneficiaries, repudiated their agreement made in court at the hearing of October 15, 2020." The court concluded: "Such action appears to be an act of concealment in violation of the co-trustees' duty of undivided loyalty to the trust beneficiaries."

We detect no error, and appellants have shown none, in the trial court's determinations and analysis regarding the trustees' breaches of the duties of impartiality and loyalty.

## C. *Duty to Avoid Conflicts of Interest and Duty to Properly Exercise Discretionary Powers*

The trial court observed that in line with the duty to avoid conflicts of interest, "[a] trustee may not under normal circumstances be allowed to have any personal dealings in the trust property or acquire an interest in them." (See *Toedter v. Bradshaw* (1958) 164 Cal.App.2d 200, 208; see also Prob. Code, § 16004, subd. (a).)

The trial court noted, however, that in this instance, "the trust instrument confers upon the co-trustees the power to acquire trust property where, in the exercise of co-trustees' reasonable discretion, such action is required to carry-out the purpose of the trust."

The prefatory paragraph of Article X of the trust instrument provides: "In order to carry out the provisions of the trusts created by this instrument, the Trustee shall have [the] powers [listed in paragraphs A through Q of Article X] in addition to those now or hereafter conferred by law." Among the listed powers is the power "to purchase assets of trust at their fair market value as determined by an independent appraisal of those assets." (Article X, paragraph H.) In addition, paragraph O of Article X provides: "In making any division or partial or final distribution of the trust estate[,] the Trustee shall be under no obligation to make a prorata division, or to distribute the same assets to beneficiaries similarly situated; but rather, the Trustee may, in the Trustee's discretion, make a nonprorata division between trust or shares and nonprorata distributions to such beneficiaries, as long as the respective assets allocated to separate trusts or shares, or distributed to beneficiaries, have equivalent or proportionate fair market value."

Here, the trial court explained: "The trust instrument does not direct the trustee to perform any one of the actions authorized under Sections A through Q of Article X. Instead, the actions are only authorized as needed in 'order to carry out the provisions of

39.

the [Family Trust].'  In other words these powers are discretionary, to be used as the trustee, in the exercise of trustee's discretion, deems appropriate."

The court further noted:  "In addition to the interpretation of the trust instrument, the court is also mindful of the fact that the powers granted the co-trustees under the terms of the trust do not supersede co-trustees' fiduciary obligations under California Probate Law."  (See Prob. Code, § 16202 ["The grant of power to a trustee … by the trust instrument … does not in itself require or permit the exercise of the power.  The exercise of a power by a trustee is subject to the trustee's fiduciary duties."]; see also Prob. Code, § 16080 [a discretionary power conferred on a trustee is not left to the trustee's arbitrary discretion, but shall be exercised "reasonably"]; *Estate of Ferrall* (1953) 41 Cal.2d 166, 172 [trustee is granted discretion for the purpose of allowing the trustee a certain leeway in accomplishing the purposes of the trust, but not to simply act at trustee's whim and caprice].)  )

The court explained:  "The trust instrument in this case does not provide specifications for the removal of a trustee.  Therefore, the request for removal must be based on those statutory grounds for removal as set forth under Probate Code [section] 15642 and California case law relating to the removal of a trustee."  The court added: "To prove his case, Petitioner Richard must show that removal is necessary to prevent detriment to the trust."  (See *Getty v. Getty* (1988) 205 Cal.App.3d 134, 140.)

The question of whether a trustee should be removed is a matter within the sound discretion of the court and dependent on the circumstances of each case.  (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 633; *Estate of Keyston* (1951) 102 Cal.App.2d 223, 228, overruled on other grounds by *Estate of Schloss* (1961) 56 Cal.2d 248, 256.)  Traditionally, courts will defer to the express intent of the settlor and are therefore reluctant to remove a trustee named by the settlors.  The court will only remove a trustee

appointed by the settlors upon demonstrated abuse of powers reflecting an "extreme showing of trustee misconduct." (See *Copley v. Copley* (1981) 126 Cal.App.3d 248, 286-287.)

Here, the trial court determined:

> "The circumstances under which the co-trustees purchased the trust properties were critical to the determination of whether the co-trustees committed a breach of trust in this case. Specifically, before deciding to purchase these properties, the co-trustees had previously reached an in-court agreement with the non-trustee beneficiaries to obtain written appraisals on each of the properties, to be immediately distributed to the non-trustee beneficiaries ahead of the professional mediation to facilitate the parties' efforts to resolve the remaining issues regarding the administration and distribution of the Family Trust. Instead of following through as agreed, the co-trustees decided not to meaningfully participate in any mediation to resolve 'the whole matter,' opting instead to unilaterally resolve the whole matter by acquiring all of the trust properties from the Family Trust for their own, buying-out the other beneficiaries' interests for cash."

The court concluded: "The court finds that the co-trustees' actions in repudiating the in-court agreement of October 15, 2020, and proceeding in a manner contrary to such agreement, without any further discussion or advance notice to the objecting beneficiaries, constituted a breach of the co-trustees' fiduciary duties and calls for the removal of the co-trustees for the preservation of the Family Trust estate and to prevent further injury to the beneficiaries of the Family Trust." The court emphasized that the trustees' actions constituted " 'an extreme act of misconduct,' " resulting in " 'a breach of trust on the part of the co-trustees and a breach of co-trustees' fiduciary duties.' "

We detect no error in the court's findings and analysis and affirm the court's removal of trustees.

## III. Trustees' Actions Were Harmful to the Trust

Trustees next argue that "the trial court erred in removing the appellants as co-trustees of the family trust because the appellants paid full fair market value for the trust properties and there was no potential or threatened detriment to the trust or the other beneficiaries." (Capitalization omitted.)

First, the premise of trustees' argument is faulty. Trustees suggest the trial court found, for purposes of its decision of Richard's amended removal petition, that the trustees' valuation of the properties they transferred to themselves represented the fair market value of the properties at the relevant time. However, the trial court's statement of decision on Richard's amended removal petition does not include any such finding.

The trial court's statement of decision on the trustees' petition for approval of accounting states: "This court is tasked with determining which value to use for these properties, *at least for purposes of determining whether or not to approve the accounting submitted by the co-trustees*." (Italics added.) For purposes of approving the accounting, the court found that "the values listed in the co-trustees' accounting accurately reflect the fair market value of the subject property at the time of the written appraisals submitted by Mr. King." However, trustees' counsel did not request or obtain a finding by the court as to the fair market value of the trust properties for all purposes or at least for purposes of Richard's amended removal petition.

Second, trustees' argument that their unilateral actions in transferring the trust properties to themselves in utter disregard of the parties' settlement agreement and without notice to or consent from Richard and Gary, did not result in any detriment to the trust, is unavailing. As the trial court properly found, the trustees violated the parties' settlement agreement and violated their fiduciary duties in unilaterally, and without circulating the updated property appraisals, transferring the trust properties to themselves

42.

in advance of the agreed-upon mediation.  The trustees' misconduct has resulted in ongoing litigation and prevented the orderly distribution of the trust's assets to the beneficiaries, in contravention of the settlors' intent.  The wrongful transfer of the trust's assets, as occurred here, harms the trust; it constitutes misappropriation of assets.  (See, e.g., *Estate of Ferber* (1998) 66 Cal.App.4th 244, 253 [a probate court has the responsibility "to protect the estate and ensure its assets are properly protected for the beneficiaries"].)

## IV.     Trial Court's Disallowance of the Final Three Months of Attorneys' Fees Claimed by Trustees in Their Accounting, Was Not an Abuse of Discretion

Trustees' final argument on appeal concerns one aspect of the trial court's resolution of their petition for approval of accounting.  The accounting covered the period from June 30, 2017 through December 31, 2020 and reflected attorneys' fees charged to the family trust over the course of the entire accounting period.

The trial court approved the attorneys' fees included in the accounting, with the exception of attorneys' fees "incurred after September, 2020 to the end of 2020."  The court ruled that, "the accounting reflects attorney's fees paid from October, 2020 through December, 2020 at $71,199.70," which amount "shall be surcharged back against the co-trustees' distributive shares."

The court explained its primary rationale for disallowing the three months of attorneys' fees:  "The court finds that the co-trustees' actions in unilaterally repudiating the in-court agreement of October 15, 2020, and proceeding in a manner contrary to such agreement, without any further discussion or advance notice to the non-trustee beneficiaries, was an extreme act of misconduct undertaken in bad faith and constituted a breach of the co-trustees' fiduciary duties."

We review a probate court's ruling surcharging a trustee for an abuse of discretion (*Estate of Moore* (2015) 240 Cal.App.4th 1101, 1105), and review any subsidiary factual

43.

findings for substantial evidence (see *Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 544). Under the circumstances applicable here, we cannot say the trial court's surcharge order represented an abuse of discretion.

## **<u>DISPOSITION</u>**

The judgment is affirmed. Richard Callaway is awarded his costs on appeal.

SMITH, J.

WE CONCUR:

DETJEN, Acting P. J.

PEÑA, J.